**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court."
Although it is posted on the internet, this opinion is binding only on the
parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0960-16T4

A.T.M.,

    Plaintiff-Respondent,

v.

R.P.M.,

    Defendant-Appellant.

_____

        Argued May 7, 2018 — Decided June 6, 2018

        Before Judges Ostrer and Firko.

        On appeal from Superior Court of New Jersey,
        Chancery Division, Family Part, Camden County,
        Docket No. FM-04-0337-05.

        Patricia Ronayne argued the cause for
        appellant (Law Office of Patricia Ronayne, PC,
        attorneys; Patricia Ronayne, on the brief).

        Michael A. Weinberg argued the cause for
        respondent (Archer & Greiner, PC, attorneys;
        Michael A. Weinberg, of counsel; Jennie A.
        Owens, on the brief).

PER CURIAM

    Defendant R.P.M. appeals from the denial of a post-judgment

motion to modify or terminate his alimony obligation. The trial

court ruled the alimony obligation was not modifiable based on

anti-<u>Lepis</u>[1] language set forth in the parties' Property Settlement Agreement ("PSA") incorporated into the Final Judgment of Divorce ("FJOD").  The trial judge denied defendant's request to exchange discovery and conduct a plenary hearing.  We affirm the decision to uphold the anti-<u>Lepis</u> provision and reverse and remand for further proceedings to determine defendant's ability to pay current support, arrearages, and other obligations.

The parties were married in 1979 and divorced in 2004.  They have two children who were both emancipated at the time defendant filed his motion.  The parties separated in 2001 and negotiated the terms of their agreement without the benefit of counsel, formal discovery or financial disclosures.  The PSA was then drafted by plaintiff's counsel.

Pertaining to the equitable distribution of assets, plaintiff received the former marital home free of any encumbrances. Defendant retained any equitable interest in BRS Produce Co., Inc., a family business.  Defendant's IRA and asset accounts were divided equally.  Plaintiff retained her leased vehicle through termination and thereafter, defendant purchased a vehicle outright for her.  Furthermore, defendant agreed to pay for undergraduate

---

[1] <u>Lepis v. Lepis</u>, 83 N.J. 139 (1980).

and post-graduate educational expenses for the unemancipated child.

Alimony was based on defendant's employment in BRS Produce. At that time, defendant reported a gross income of $115,000 per year.[2] The parties agreed that defendant was the primary wage earner. Plaintiff was a stay at home mother who raised the children, who are now emancipated. At the time of divorce, she earned $10,000 per year. Commencing upon the execution of the PSA, defendant agreed to pay $800 per week in non-taxable, permanent alimony, plus semi-annual lump sum payments of $10,000 on or before June 30 and December 15. The only condition stipulated to in the PSA in respect of terminating alimony was the death of either party. In relevant part, the PSA states:

> Further, the [defendant] represents and acknowledges that he has sufficient assets to meet his permanent alimony obligation set forth herein even if his income would not otherwise warrant said spousal support obligation and he has, therefore, chosen and voluntarily agreed to make said permanent alimony obligations to [plaintiff] non-modifiable.

---

[2] In addition, defendant received other benefits and perquisites not specifically delineated. It is unknown whether he had an ownership interest in the business.

In addition to alimony payments, defendant is obligated to provide plaintiff with private healthcare coverage and to maintain a $600,000 life insurance policy naming her as the beneficiary in order to secure his obligations to her.

After complying with the terms of the PSA for approximately eleven years, defendant ceased making alimony payments. On August 4, 2015, plaintiff moved to enforce the PSA and defendant cross-moved to modify his support obligations. In a decision rendered on October 2, 2015, following oral argument, the trial court enforced the terms of the PSA, and denied defendant's motion, finding the non-modifiable provisions of the PSA to be "iron clad."[3] Plaintiff asserts that this decision constituted an adjudication on the merits as to the anti-Lepis provision.

Less than a year later on July 28, 2016, defendant moved again to modify or terminate his support obligation. He submitted no new evidence, except a forensic accounting report. For the second time, defendant challenged the validity of the anti-Lepis provision. The court denied defendant's motion, and this appeal ensued.

The PSA contains the following preamble:

---

[3] The record is devoid of any motion for reconsideration or appeal from the October 2, 2015 order. We deem said order to be final pursuant to Rule 2:4-1 and not interlocutory.

This preamble is being written to explain the process that was undertaken to reach this [PSA]. It should be explained that this is not a typical divorce case. Upon their separation in or about July, 2001, [defendant] and [plaintiff] met and negotiated the terms of this Agreement, orally, without the involvement of counsel. Their compromises were made in order to avoid long divorce proceedings involving significant time, expense and emotion. The partie[s] negotiations were conducted without the benefit of formal discovery. Both parties, however, have been fully advised and understand their right to obtain formal discovery before entering into this [PSA].

After execution of the PSA, and five days before the FJOD was granted, defendant also executed a notarized "Affidavit of Defendant Re: Voluntary Execution of [PSA]." The affidavit provides in relevant part that: "The [PSA] in its final form is a compromise of my initial position and the initial position of my spouse"; "[c]onsidering that the [PSA] is a compromise, I nevertheless consider it to be fair and equitable"; and "I intend to be bound by the [PSA]."

I.

As his initial point on appeal, defendant argues that the trial court "erred in declining to find the [PSA] unconscionable under [R.] 4:50-1(f) and, in doing so, abused her discretion in declining to modify and/or terminate defendant's support obligations contained in the [PSA]." We disagree.

A-0960-16T4

Rule 4:50-1(f) provides: "On motion, with briefs, and upon such terms as are just, the court may relieve a party or the party's legal representative from a final judgment or order for . . . any other reason justifying relief from the operation of the judgment or order."

The rule is "designed to reconcile the strong interests in finality of judgments and judicial efficiency with the equitable notion that courts should have authority to avoid an unjust result in any given case." US Bank Nat'l Ass'n v. Guillaume, 209 N.J. 449, 467 (2012) (citation omitted). Nevertheless, relief under Rule 4:50-1(f) is available only when "truly exceptional circumstances are present." Baumann v. Marinaro, 95 N.J. 380, 395 (1984) (citation omitted). Since the rule deals with exceptional circumstances, each case must be resolved "on its own particular facts." Ibid.

"The trial court's determination under the rule warrants substantial deference, and should not be reversed unless it results in a clear abuse of discretion." Guillaume, 209 N.J. at 467. An abuse of discretion exists when a decision has been "made without a rational explanation, inexplicably departed from established policies, or rested on an impermissible basis." Id. at 467-48 (citations omitted).

6

Unconscionability can serve as a basis to invalidate an agreement in New Jersey. <u>Saxon Constr. & Mgmt. Corp. v. Masterclean, Inc.</u>, 273 N.J. Super. 231, 236 (App. Div. 1994). It exists when there is "overreaching or imposition resulting from a bargaining disparity between the parties, or such patent unfairness in the contract that no reasonable person not acting under compulsion or out of necessity would accept its terms." <u>Howard v. Diolosa</u>, 241 N.J. Super. 222, 230 (App. Div. 1990) (citation omitted). The courts should look to two factors in cases dealing with unconscionability: "(1) unfairness in the formation of the contract, and (2) excessively disproportionate terms. These two elements have been described as "procedural" and "substantive" unconscionability." <u>Sitogum Holdings, Inc. v. Ropes</u>, 352 N.J. Super. 555, 564 (Ch. Div. 2002) (citation omitted). Substantive unconscionability "suggests the exchange of obligations so one-sided as to shock the court's conscience." <u>Id.</u> at 565.

Here, the trial court determined that the PSA was not unconscionable. The judge reasoned:

> [t]he payments were not unconscionable at the time, given the income level stated in the agreement, the length of the marriage of the parties, and the economic dependency of the plaintiff. The agreement was not unconscionable at that time, and it was, in

fact, based on an income level that defendant exceeded for many years after the agreement.

Moreover, the record fully supports the trial court's conclusion. As the judge found, this was a long term marriage of twenty-five years. Defendant earned a relatively high level of income and plaintiff was the primary caretaker of the children. No Matrimonial Case Information Statements were ever exchanged. The produce business was never evaluated for equitable distribution purposes. As partial consideration for the PSA, plaintiff waived her right to pursue a cause of action against defendant for his transmitting the human papillomavirus infection to her, which he acknowledged doing on the record and in a certification.[4] As aptly pointed out by plaintiff, the statute of limitations has now expired insofar as it relates to transmission of the virus to her and her ability to litigate this issue against defendant.[5]

---

[4] See Tevis v. Tevis, 79 N.J. 422 (1979). The entire controversy doctrine is set forth in Rule 4:30A. "Non-joinder of claims required to be joined by the entire controversy doctrine shall result in the preclusion of the omitted claims to the extent required by the entire controversy doctrine, except as otherwise provided by [Rule] 4:64-5 (foreclosure actions) and [Rule] 4:67-4(a) (leave required for counterclaims or cross-claims in summary actions)."

[5] See N.J.S.A. 2A:14-2 (establishing two-year limitations period for personal injury actions).

We find no basis to conclude that there was "unconscionability, fraud, or overreaching in negotiations of the settlement," to provide a basis for vacating or modifying the PSA. J.B. v. W.B., 215 N.J. 305, 326 (2013) (citation omitted). The trial court duly found that this case was not sufficiently "extreme" to warrant modification despite the anti-Lepis clause. Morris v. Morris, 263 N.J. Super. 237, 244 (App. Div. 1993). "There is no great inequity, since each party has the expected benefit and burden of the contact." Ibid.

From the record we have, defendant has failed to prove that he is entitled to have the PSA invalidated. Motions made pursuant to R. 4:50-1(f) are to be granted sparingly and are within the sound discretion of the trial court. Guillaume, 209 N.J. at 467. Nothing presented herein suggests that the PSA was procured unfairly by fraud, falsehood, or duress, or that it was wholly unconscionable when entered. Wertlake v. Wertlake, 137 N.J. Super. 476 (App. Div. 1975). Defendant has failed to establish exceptional and compelling circumstances to justify the relief he seeks in setting aside the PSA.

## II.

We turn next to defendant's argument that he was entitled to a modification of his alimony obligation.

"Each and every motion to modify an alimony obligation 'rests upon its own particular footing and the appellate court must give due recognition to the wide discretion which our law rightly affords to the trial judges who deal with these matter.'" Larbiq v. Larbiq, 384 N.J. Super. 17, 21 (App. Div. 2006) (citation omitted). We do not overturn such discretionary decisions "unless the court abused its discretion, failed to consider controlling legal principles or made findings inconsistent with or unsupported by competent evidence." Storey v. Storey, 373 N.J. Super 464, 479 (App. Div. 2004).

Although it is well established that matrimonial agreements represent enforceable contracts, "[a]t the same time, 'the law grants particular leniency to agreements made in the domestic arena,' thus allowing 'judges greater discretion when interpreting such agreements.'" Pacifico v. Pacifico, 190 N.J. 258, 265-66 (2007) (citation omitted). "The court's role is to consider what is written in the context of the circumstances at the time of drafting and to apply a rational meaning in keeping with the 'expressed general purpose.'" Id. at 266. (citation omitted).

Applying the above standards, we hold the trial court was correct in finding the anti-Lepis provision valid. The trial court held:

> In this agreement, there are no ambiguities, no missing terms, and the court does not find there was overreaching or that the plaintiff was in a superior negotiating position. Thus, when the intent of the parties is plain, the language is clear, the court must enforce the agreement as written unless doing so would lead to an absurd result. Quinn v. Quinn, [225 N.J. 34 (2016)] again citing [Sachau v. Sachau, 206 N.J. 1 (2011)].
>
> The language and the intent of this agreement are clear. Currently, the agreement provides results that are very difficult for the defendant. He is now earning less than he was at the time of the agreement, and it is more difficult for him to meet his obligations. However, the court cannot find that the current decrease represents an unanticipated event or an absurd result; therefore, the defendant's application to set aside or modify the agreement must be denied.

Based upon the trial court's decision, we concur that there was no "overreaching or imposition resulting from a bargaining disparity between the parties, or such potent unfairness in the contract that no unreasonable person not acting under compulsion or out of necessity would accept its terms." Howard v. Diolosa, 241 N.J. Super. 222, 230 (App. Div. 1990).

The "exceptional circumstances" advanced by defendant were clearly foreseeable when the PSA was executed. Reviewing the plain language of the PSA, it specifically states "both parties waive their right to seek a modification and/or termination of [defendant's] alimony obligation to [plaintiff], and both parties

warrant and represent that this waiver is irrevocable." Moreover, defendant "represent[ed] and acknowledge[d] that he has sufficient assets to meet his permanent alimony obligation set forth herein even if his income would not otherwise warrant said spousal support obligation, and he has, therefore, chosen and voluntarily agreed to make said permanent alimony obligation to [plaintiff] non-modifiable." There is no unfair surprise as the PSA specifically provides that the parties contemplated any "prospective changes in their incomes."

Defendant's reported Medicare wages for calendar years 2004 through 2014 were provided to the trial court. Post-divorce, defendant's earnings exceeded $115,000 - sometimes by multiples of two or three - each year except 2012 and 2014.

### III.

Notwithstanding the validity of the anti-Lepis clause of the PSA, as we noted in Morris, a finding that the parties intended their matrimonial settlement agreement not be subject to modification for changed circumstances does not end the inquiry. Morris, 263 N.J. Super. at 244. The trial judge "has both the power and duty to establish a reasonable level of current payment based upon defendant's income, assets, and reasonable resort to credit." Ibid.

Defendant retained a forensic accountant, Frederick Bucci, CPA, to evaluate his current income vis-à-vis his support obligations. Based upon Mr. Bucci's analysis, in 2015, defendant's disposable income was essentially the same as his support obligations. In 2014, his support obligations constituted approximately 120% of his disposable income; and in 2013, 61.72% of his disposable income. He contends that he was able to comply with his obligations in the past because he received bonuses. He is now liquidating savings and retirement accounts in order to comply with not only the terms of the PSA, but the October 2, 2015 order as well. Defendant contends that his depressed circumstances leave him with almost no disposable income and diminishing capital assets available to liquidate.

The Morris court noted the blatant inequity of not enforcing an agreement in which the parties expressly "provided for defendant's future decreased ability to pay - '[i]f defendant's income increased, he could hold plaintiff to her agreement; if it decreased, he inequitably could claim an inability to pay and avoid his debt to her.'" Id. at 242, 244. Defendant was required to pay the agreed upon alimony if he had the means to do so, and, if not, the unpaid balance would accrue until his fortunes improved. Id. at 244. If defendant's financial situation did not improve and his arrearages accumulated, then that would be the

13                                                                    A-0960-16T4

result he bargained for when plaintiff gave up her <u>Tevis</u> claim and her potential equitable distribution claim in respect of his produce business. As explained in <u>Morris</u>, there is "no great inequity" because "each party has the expected benefit and burden of the contract." <u>Ibid.</u>

The motion judge "has both the power and duty to establish a reasonable level of current payment based upon defendant's income, assets, and reasonable resort to credit." <u>Ibid.</u>; N.J.S.A. 2A:34-23.

Based upon the record before us, we find that defendant has established a prima facie showing of changed circumstances. <u>Hand v. Hand</u>, 391 N.J. Super. 102, 106 (App. Div. 2007). Therefore, we remand to the trial court for an ability-to-pay hearing. <u>See</u> <u>Schochet v. Schochet</u>, 435 N.J. Super. 542, 548 (App. Div. 2014). This distinction is made from a plenary hearing because:

> [t]he <u>Rule</u> 1:10-3 hearing is not a plenary to decide the appropriate amount of support an obligor should pay. That amount has been determined, either by the court following a trial or post-judgment motion, or by the parties themselves. The hearing is also not a substitute for an appeal or a motion to modify the obligation based on changed circumstances. The hearing comes about because an obligor has failed to comply with an order. The objective of the hearing is simply to determine whether that failure was excusable or willful, i.e., the obligor was able to pay and did not. It does not establish

A-0960-16T4

the future obligation of the party paying support.

Ibid.

We affirm the order entered by the trial court insofar as it upholds the validity of the PSA and anti-Lepis provision. We remand to the trial court to conduct an ability-to-pay hearing as to defendant's current financial circumstances consonant with his arrearages, alimony, and other obligations.

We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

15
A-0960-16T4